UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | 3:16-CR-30039-RAL |
| Plaintiff, | |
| | OPINION AND ORDER ADOPTING |
| vs. | REPORT AND RECOMMENDATION |
| | AND DENYING  DEFENDANT'S |
| SYLVAN LARRABEE, | MOTION TO SUPPRESS |
| Defendant. | |

The Government charged Sylvan Larrabee with two counts of sexual abuse of a minor. Doc. 1. Larrabee moved to suppress incriminating statements he made to federal investigators on voluntariness grounds. Doc. 25. After holding an evidentiary hearing, Magistrate Judge Mark A. Moreno issued a Report and Recommendation, recommending that Larrabee's motion be denied in its entirety. Doc. 48 at 8. Larrabee has filed timely objections to that recommendation. Doc. 51. This Court has conducted a de novo review of the record, and for the reasons explained below, overrules Larrabee's objections and adopts Judge Moreno's Report and Recommendation.

I.    **Facts**

On August 27, 2015, FBI Special Agents James Asher and Thomas Wilberg met with Larrabee inside their vehicle, for about an hour. Ex. 1. At the conclusion of the interview, Larrabee left the vehicle without being arrested. Tr. at 9–10. The meeting took place within the Cheyenne River Indian Reservation, in an isolated area near Cherry Creek, South Dakota, where Larrabee was living. Tr. at 7, 24. The agents had contacted Larrabee and requested a meeting; at a pre-arranged time, Larrabee arrived on a four-wheeler. Tr. at 24. After Larrabee joined the

1

agents in their vehicle, the agents informed Larrabee that they were investigating the suicide of

T.D., a 14-year-old. Ex. 1 at 2:25.  Agent Asher advised Larrabee that he was going to "let you

know your rights," and then told Larrabee that he did not have to speak with the agents, that the

door to the vehicle was unlocked and Larrabee could leave at any time including after he had

started speaking to the agents, and that there was a recorder in the vehicle.  Ex. 1 at 1:29–2:00;

see also Tr. at 8–9.  During these initial minutes, Larrabee said that he had never before been in

contact with the FBI. Ex. 1 at 2:20.

Larrabee began by stating that he had only been in contact with T.D. a few times in the

year that he had known her, centered around giving T.D. and her friend matching tattoos, while

her boyfriend was present. Ex. 1 at 5:06.  Larrabee also said that he first met T.D. when he went

to play basketball with T.D.'s boyfriend. Ex. 1 at 10:00.  As the interview continued, Larrabee

gave more information to the agents about the contacts between himself and T.D.    He

volunteered that he stopped hanging around with T.D. when her mom slapped him in public, Ex.

1 at 10:40, and that he said "I ain't messing with your daughter or anything," Ex. 1 at 11:06, but

that he thought T.D.'s mom was mad at him because of the tattoo that he gave T.D.

Approximately 15 minutes into the interview, the agents said that they talked with T.D.,

that she reported dating Larrabee, and that T.D.'s friends told the agents that T.D. and Larrabee

were dating.  Ex. 1 at 14:45–15:10.  Larrabee then volunteered that T.D. was "after me,"

describing her as a "stalker" who was upsetting to his "babymomma." Ex. 1 at 15:39–16:00.

Shortly after this conversation, Agent Asher stated that he did not want Larrabee "to get caught

up in a lie, 'cause that's the one thing you could get in trouble for.'" Ex. 1 at 19:07.  Larrabee

was then asked if T.D. had ever spent the night at his grandmother's house, and Larrabee said no.

Ex. 1 at 19:13.  Larrabee continued to describe T.D. and her personality at the prompting of the

2

agents, but denied that he ever kissed her. Ex. 1 at 19:30–22:30.  Agent Asher repeated to Larrabee that "if you did something with [T.D.] it's the past, you just need to let me know and move forward, I'm not gonna go talk to your babymomma, I just don't want you to get caught up in something that's a lie, because you know that's where you get in trouble," Ex. 1 at 22:58, and "if you get caught up in a lie, that's when it's gonna get bad," Ex. 1 at 24:00.  Agent Asher repeated his understanding that Larrabee didn't want to get caught up in wrongdoing because he had a job and a new child at stake, and just wanted to move on with his life.  Ex. 1 at 24:00–24:40.  Larrabee's voice started to sound distressed at this point.  Ex. 1 at 24:12, 24:41, 25:00. Larrabee then stated that "if you wanna hear what you wanna hear, I'ma say it," Ex. 1 at 24:42, to which Agent Asher responded that he only wanted the truth, Ex. 1 at 24:49.  Larrabee's voice returned to normal, and he stated that the confrontation with T.D.'s mom, mentioned earlier, was actually about T.D.'s mom saying she was taking T.D. to Pierre to "get tested," and that he was going to face rape charges.  Ex. 1 at 25:32.  Larrabee wondered how this was possible because he had never been with her.  Ex. 1 at 25:37.  When Agent Asher asked how he would explain physical evidence of a sexual relationship between T.D. and Larrabee, Larrabee inquired whether the evidence could be from another individual or multiple individuals.  Ex. 1 at 25:58–26:15. After Agent Asher asked whether the sex between Larrabee and T.D. was consensual, Larrabee responded "this is how it went down," Ex. 1 at 27:27, and described the sex that occurred, how he had just "let it happen," Ex. 1 at 27:35, and that it happened "just two times," Ex. 1 at 27:56.

Shortly after this initial admission, a click sound is heard in the audio recording, Ex. 1 at 29:48, and one of the agents says "oops, sorry it's unlocked," and another click is heard, Ex. 1 at 29:50.  The agent then thanked Larrabee for being honest, and Larrabee said he did not say anything previously because he did not want to go to jail on rape charges: "I didn't rape no girl,

3

the girl came to me," Ex. 1 at 33:00, and she was "all grown up about it," Ex. 1 at 33:10. Agent

Asher testified that at this point, he took Larrabee's statements to mean that Larrabee understood

what the interview's intended purpose was. Tr. at 17–18. Larrabee also said that he knew the

sexual contact was wrong, because a friend had told him he should stay away from T.D. Ex. 1 at

34:00. Agent Asher asked Larrabee, "You do know why we had to come out here and chat with

you?" Ex. 1 at 36:49, to which Larrabee responded he "knew this day was gonna come," Ex. 1 at

36:52, and that it was because T.D. had said she had been "with me," Ex. 1 at 37:09.

Larrabee then described the two incidents of sex with T.D. in detail, in a calm manner.

Ex. 1 at 38:45. Larrabee stated that "if anything I should press rape charges on her," Ex. 1 at

46:40, that "if I was younger I probably would have married her," Ex. 1 at 48:15, and that he

didn't like her, but maybe would have if she was "my age" and "clean," and "wasn't as ratchet as

she was," Ex. 1 at 51:20. Larrabee then again described the personality of T.D. as not a classy

girl, but a "ratchet girl," and explained the difference. Ex. 1 at 51:50. Towards the end of the

interview, Larrabee's voice changed again when he said he "don't want to go to jail for

something . . . I didn't do, because I didn't like hook up with her, she hooked up with me." Ex. 1

at 54:50. The agent then told Larrabee that "with you being cooperative, it's going to go much

smoother." Ex. 1 at 55:20. Larrabee reiterated that he and T.D. were not in a relationship. Ex. 1

at 56:02. The agents thanked Larrabee for his honesty, Ex. 1 at 56:10, asked for a follow-up

phone number, Ex. 1 at 54:19, and allowed Larrabee to leave the vehicle without arrest, Ex. 1 at

56:20.

On March 15, 2016, an Indictment was filed in the United States District Court, District

of South Dakota, Central Division, charging Larrabee with two counts of sexual abuse of a minor

under 18 U.S.C. §§ 1153, 2243(a), 2246(2)(A). On May 27, 2016, Larrabee filed a motion to

4

suppress his statements made during the interview on the grounds that the statements were involuntary as a result of the improper and deceptive interrogation and implied promises made by the agents that overbore his will. Doc. 26. At the hearing on the motion to suppress, the court took judicial notice of the fact that Larrabee was "23 years old and had a 10th grade education." Tr. at 5. Agent Asher testified at the hearing that during the course of the interview, Larrabee was in the passenger seat of Asher's government vehicle, with Agent Wilberg in the backseat. Tr. at 8. Agent Asher testified that the interview was "friendly in nature" and was not "threatening or loud in any way," Tr. at 10; that it did not appear that Larrabee had any sort of diminished mental capacity or was under the influence of any substance that could impair him, Tr. at 11–12; that there was no physical contact between the agents and Larrabee, Tr. at 23; and that no weapons were displayed during the interview, Tr. at 23.

## II.    Discussion

This Court reviews a report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Larrabee objects to Judge Moreno's determination that there was no proof of coercion or tactics used by the agents that overbore his will. Doc. 51 at 2. Specifically, Larrabee contends that lies told by the agents to Larrabee regarding the reasons for the interview, their previous interactions with T.D., and repeated statements that Larrabee could only get in trouble for lying to the agents overbore his will. Doc. 51 at 3–4. Having conducted a de novo review, this Court adopts the Report and Recommendation.

5

The Fifth Amendment privilege against self-incrimination protects criminal defendants from being compelled by the government to incriminate themselves. Miranda v. Arizona, 384 U.S. 436, 467 (1966). A voluntary statement or confession may be used against a defendant in court, but an involuntary statement or confession may not. Schneckloth v. Bustamonte, 412 U.S. 218, 226–27 (1973). A court must consider the totality of the circumstances, including the conduct of the officers and the characteristics of the defendant, to determine whether a statement is voluntary. United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc); United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998). A statement is involuntary if made by a defendant whose "will [was] overborne and his capacity for self-determination critically impaired" by "threats, violence, or direct or implied promises." United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995) (internal quotations omitted) (alteration in original). The government has the burden of proving the defendant's statement was voluntary, which must be proven by a preponderance of the evidence. United States v. Anaya, 715 F. Supp. 2d 916, 949 (D.S.D. 2010) (citing Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004)). Defense counsel does not allege that Larrabee was in a custodial situation that would necessitate the reading or application of his full Miranda rights.

Interview tactics utilized by government officers such as "claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using [the suspect's] respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices" do not necessarily "render a confession involuntary." United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005). An implied or asserted promise made by law enforcement before incriminating statements are made is a factor to consider when determining the voluntariness of a statement, but it does not make the statement per se involuntary. See

Smith v. Bowersox, 311 F.3d 915, 922 (8th Cir. 2002); United States v. Larry, 126 F.3d 1077, 1079 (8th Cir. 1997) (per curiam); Kilgore, 58 F.3d at 353. Specifically, "[i]t is improper for a police officer to obtain a confession through an express or implied promise of leniency," but "such a promise will not render the confession involuntary unless it overcomes the defendant's free will and impairs his capacity for self determination." Smith, 311 F.3d at 922.

The Eighth Circuit noted decades ago in Tippitt v. Lockhart that "[v]arious courts have held that government agents . . . may even be able to make and breach certain promises without rendering a resulting confession involuntary." 859 F.2d 595, 597 (8th Cir. 1988) (confession was voluntary where there was a fulfilled promise of non-prosecution for one crime, but prosecution for another stemming from the confession). In Smith v. Bowersox, the Eighth Circuit determined that when a defendant stated "I'm going to get the chair for this," and the law enforcement officer responded "No, you're not, because they don't do that in this state," id. at 917, although it was an implied promise of leniency, when placed into consideration with other factors turning on voluntariness, the state court determination that the confession was voluntary could not be overturned, id. at 922–23. In United States v. LeBrun, the Eighth Circuit held that after insinuations by law enforcement officers that he would not be prosecuted for murder if it was spontaneous, and the defendant confessed to felony murder under that mistaken belief, the confession was not involuntary when all other aspects of the interrogation were not enough to "demonstrate that the authorities overbore [the defendant's] will and capacity for self-determination." LeBrun, 363 F.3d at 725–26; see also United States v. Thunderhawk, 799 F.3d 1203, 1206 (8th Cir. 2015) (reiterating that the "polestar" in determining the voluntariness of a confession is whether any promise made by law enforcement was enough to overbear the defendant's will). In United States v. Larry, the Eighth Circuit reversed a district court decision

7

that a promise of non-prosecution rendered a confession involuntary, finding that it must only be "one of the circumstances" considered in determining voluntariness. Larry, 126 F.3d at 1078–79; see also United States v. Englehart, 811 F.3d 1034, 1043 n.3 (8th Cir. 2016) (comment from officer "that he was not 'too concerned about personal [marijuana] use" was not a promise of leniency to render confession involuntary).

The deception tactics used by the agents in this case were not impermissible means of obtaining a confession from a defendant. Agent Asher did not immediately tell Larrabee he was being investigated for committing a sex crime but as the interview developed, it became apparent that Larrabee knew why the agents had contacted him. Ex. 1 at 36:49–37:10; Tr. at 17–18; see also Evans v. Dowd, 932 F.2d 739, 742 (8th Cir. 1991) (per curiam) (officer misstating the purpose of the interrogation did not render the resulting confession inadmissible). Similarly, although the Agent insinuated he had more proof than he did, this is a common, permissible tactic in interview situations. See Frazier v. Cupp, 394 U.S. 731, 737–38 (1969); Brave Heart, 397 F.3d at 1041; Evans, 932 F.2d at 741–42. Furthermore, Larrabee questioned the availability of this proof and the extent of the Agent's purported knowledge. Ex. 1 at 25:58–26:15.

At least two of the three statements made by the agents to Larrabee that he could only get in trouble for lying were improper implied promises of leniency, indicating indirectly to Larrabee that he would not get in trouble for sexual contact with T.D. See Ex. 1 at 19:07, 22:58,[1] 24:00. However, there is no evidence that these statements about lying were the reason that Larrabee decided to confess the alleged sexual contact, nor is there any indication that the statements, when considered in totality with the deception tactics used by the agents and the nature of the

---

[1] The statement made by Agent Asher to Larrabee at 22:58 first indicates that the agent is not going to speak to Larrabee's family about the sexual contact, then notes that Larrabee could get in trouble for lying.

interview, lead to an impairment of Larrabee's capacity for self-determination. See United States v. Astello, 241 F.3d 965, 967–68 (8th Cir. 2001) (noting that while statements involving the defendant's truthfulness "may have influenced [the defendant's] decision to tell the truth," after considering the interrogation "in its entirety," finding that they did not result in an involuntary confession); Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001) (law enforcement statement that telling the truth "would be better" for the defendant did not render confession involuntary); United States v. Umana, 750 F.3d 320, 344 (4th Cir. 2014) (defendant's confession after detectives told him that his statements as to prior crimes "would not 'cost' him anything or 'affect' him" were "permissible 'cryptic encouragement'" and did not render the confession involuntary). But see Sharp v. Rohling, 793 F.3d 1216, 1230–31 (10th Cir. 2015) (finding that where a defendant explicitly asked whether she was going to jail, and the interviewing detective said "no" nine separate times, the resulting inculpatory statements were involuntary). Before these statements by Agent Asher, Larrabee first brought up his interactions with T.D.'s mom, and began to describe T.D.'s character and personality in a negative, demeaning way. Ex. 1 at 10:40, 15:39–16:00. After Agent Asher's statements implying leniency, Larrabee continued to avoid any statement that he had been in sexual contact with T.D. Ex. 1 at 25:37. Only after Agent Asher asked whether the sexual contact may have been nonconsensual did Larrabee admit to the sexual contact, indicating he likely understood he could be in even more trouble if the sex was nonconsensual. Ex. 1 at 27:27. Throughout the interview, Larrabee made statements that attempt to shift the blame for any sexual relationship to T.D., and although prompted by the agents, did not admit to being in a dating relationship with T.D. See Ex. 1 at 14:45–15:10, 46:40, 51:20, 54:50, 56:02. Shifting the blame and failing to confess to everything suggested by law enforcement are behaviors indicative of knowledge and awareness

9

of a situation, not a will that has been overborne and a loss of self-determination. See, e.g., Smith, 311 F.3d at 923.

Defense counsel has not provided, and this Court cannot find, any indication that Larrabee's intelligence or mental state would make him "particularly suggestible," or "susceptible to having his will overborne." LeBrun, 363 F.3d at 726; see also United States v. Gallardo-Marquez, 253 F.3d 1121, 1123–24 (8th Cir. 2001) (examining a defendant's ability to resist police pressure through his intelligence and experience with law enforcement). Larrabee is 23 years old with a 10th grade education level. Tr. at 5. Although this was his first contact with the FBI, Ex. 1 at 2:20, he had been in contact with law enforcement previously, see Ex. 1 at 8:15, 44:00. Agent Asher also testified that he did not have reason to believe Larrabee had any mental incapacity during the interview. Tr. at 11–12. Larrabee was not in custody at the time of the incriminating statements and knew that he had the ability to leave at any time. See Montejo v. Louisiana, 556 U.S. 778, 795 (2009) ("When a defendant is not in custody, he is in control, and need only shut his door or walk away to avoid police badgering."). The vehicle lock sounded as if it was bumped at one point during the interview, which gave the agents the chance to point out to Larrabee—again—that the vehicle was unlocked. Ex. 1 at 29:48. The brief moments where Larrabee's voice shifts in the interview, Ex. 1 at 24:12, 24:41, 25:00, are more indicative of an understanding of guilt and fear of prosecution than of a loss of self-determination or overborne will. As the Eighth Circuit instructed in Smith, LeBrun, and Larry, this Court considers the deceitful tactics by the agents in concert with the characteristics of the defendant, and finds that the statements made by Larrabee were voluntary.

10

## III.    Conclusion

The deception tactics used by the FBI agents in this case did not violate Larrabee's Fifth Amendment rights so as to require the suppression of his statements. Larrabee voluntarily drove to a pre-arranged location and met with the agents in an unlocked vehicle, and was informed that he had the ability to leave at any time, including after he started to talk with the agents. Although the statements made by the agent that Larrabee could only get in trouble for lying were improper, considering the totality of the circumstances, Larrabee's inculpatory statements were made voluntarily and not as a result of having his will overborne or a loss of his self-determination. Thus, Judge Moreno's factual findings and legal conclusions are supported by the record of evidence and the law. Therefore, for the reasons stated above, it is hereby

ORDERED that the Report and Recommendation, Doc. 48, is adopted by this Court in its entirety. It is further

ORDERED that Defendant's objections to the Report and Recommendation, Doc. 51, are overruled. It is finally

ORDERED that Defendant's Motion to Suppress Statements, Doc. 25, is denied.


DATED this 14th day of September, 2015.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

11